FILED
MAY 23 2005

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR 05-30009 |
| Plaintiff, | \* | |
| | \* | ORDER AND OPINION ADOPTING |
| -vs- | \* | REPORT AND RECOMMENDATION |
| IRENE SHAVING, a/k/a IRENE DUBRAY, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

Defendant is charged with possession of marijuana with intent to distribute on September 9, 2004, and manufacturing a controlled substance sometime between August, 2004, and September 9, 2004. Defendant filed a motion (Doc. 16) to suppress statements she made to FBI Special Agent Patrick Kleckner ("SA Kleckner") and evidence seized by Deputy United States Marshal Robert Schulte ("Deputy Schulte") on September 9, 2004, on the grounds that 1) she did not give her permission or consent to a warrantless search, and 2) her statements were involuntary. The motion came on for hearing before the Honorable Mark A. Moreno, on May 3, 2005, with the government appearing by Assistant U.S. Attorney Jay Miller and the defendant appearing in person and with her attorney, Jana Miner. Magistrate Moreno issued his report and recommendation on the record and issued a formal report and recommendation (Doc. 31) based upon his oral findings on May 10, 2005. The defendant filed objections (Doc. 48). The Court has conducted a *de novo* review of the record, including the transcript (Doc. 29) of the motions hearing and the transcript (Doc. 32) of the magistrate's bench decision.

## BACKGROUND

Beginning in July, 2004, the United States Marshals Service was attempting to serve a warrant for Wilbur Smith, Jr. ("Smith")[1] at defendant's residence. Smith's grandfather lived near defendant and Deputy Schulte visited with defendant in an attempt to locate Smith. At that time, defendant denied knowing Smith. Three weeks later Deputy Schulte received information that Smith was residing with the defendant so, on August 13, 2004, he returned to the defendant's residence to search for Smith. At that time, the defendant stated that she had not seen Smith in quite some time and that he was not at her residence. At that time, defendant gave Deputy Schulte permission to search defendant's house and the out buildings around the property for Smith. He was not found.

The Marshals Service received newer information that Smith was staying with the defendant and, on September 9, 2004, at approximately 11:30 a.m., Deputy Schulte, Deputy United States Marshal Kelly Mutschler ("Deputy Mutschler"), Rosebud Criminal Investigators Chris Barrerra ("Barrerra") and Joe Cordier ("Cordier"), and SA Kleckner returned to defendant's residence to attempt to serve the warrant for Smith. Deputy Schulte testified that defendant advised him that Smith was not at her residence and had not been there for several weeks. Deputy Schulte testified that, once again, defendant gave him and his companions permission to search for Smith.

Smith was not found during that search. However, during the search for Smith, Deputy Mutschler found several bundles of a green leafy substance which he assumed was marijuana in a shed near defendant's residence. Deputy Schulte also saw the bundles. SA Kleckner took photographs of the contents of the shed.

Deputy Schulte (and perhaps the others) found a patch of plants growing approximately 10 - 15 feet in front of the shed which he suspected was marijuana. The plants were between five and six feet tall. The patch was circular, approximately 25 feet in circumference. Inside the

---

[1] Warrants were issued on July 20, 2004, for Smith in CR 01-30063 (involuntary manslaughter) and 01-30089 (failure to appear) arising out of petitions to revoke supervised release. He was eventually arrested on November 6, 2004.

2

circumference of the patch was an area approximately ten feet in circumference which had been harvested – cut approximately three to four inches from the ground.

After SA Kleckner photographed the plants, he went into the defendant's home to speak to her about the suspected marijuana plants found. He made out a receipt for the plants and had her sign the receipt. SA Kleckner testified that he showed defendant his credentials, told defendant who he was, that he wanted to talk to her about the marijuana found outside her house, that she did not have to speak to him, and that if she did speak to him, she could end the interview at any time. He did not give her the Miranda warnings and did not give her the complete Griffin warnings (he did not advise her that he would not arrest her following the interview). This interview lasted between five and ten minutes and was conducted while the defendant and another male individual were seated at the kitchen table and SA Kleckner was standing. SA Kleckner testified that defendant stated that the marijuana was hers and that they planned to use the plants to make rope to hang individuals from and drag skulls in connection with a sundance ceremony.

Deputy Schulte testified that, before they left that morning, the defendant told them Smith had been at the residence earlier but had gone to town in a dark colored pickup and would be returning later. The authorities left defendant's residence approximately 45 minutes after they arrived but Deputy Schulte and Deputy Mutschler returned at 1:30 p.m.

Upon arriving at the residence the second time on September 9, Deputy Schulte saw a dark pickup in the driveway and asked the defendant if Smith had returned to the residence. Deputy Schulte testified that defendant told him Smith had returned approximately ten minutes earlier, but had run into the woods when she told him the authorities had been there looking for him. Deputy Schulte testified that he again obtained the defendant's permission to "look around" the area for Smith. Smith was not located in the home so Deputies Schulte and Mutschler went into the woods in the immediate area of defendant's residence to search for him. They had not previously searched this area, which the parties refer to as the sundance area or the ceremonial area. After a few minutes, defendant came down the trail to assist the deputies. Deputy Schulte testified that the defendant stated she wanted to convince Smith to turn himself in so she led the way into the woods. Defendant walked up into the ceremonial grounds adjacent to her residence.

3

She walked up over a hill, past a red building, and continued calling out Smith's name. Deputy Schulte went over to determine whether Smith was in the red building. This building was approximately 680 yards from the defendant's residence, well over a quarter of a mile. As he approached the red building, Deputy Schulte heard music coming from inside. He knocked on the door, which was ajar, pushing it open. Smith was not in the building but Deputy Schulte saw green leafy substances, which he took to be marijuana plants, hanging from the wall to dry. In a back room, Deputy Schulte found more green leafy substance plants and buds from that green leafy plant chopped up on a plate.

The Magistrate made findings on the record that the defendant voluntarily consented to a search of her residence and property, including out buildings and structures located on the property, that defendant at no time objected to the scope of the search, that she even assisted in the search, and that there was no evidence that the defendant's consent was obtained through duress or coercion. The magistrate found that a reasonable person in the deputy's shoes would have understood that the defendant gave a general authorization to look and search for Smith anywhere on her property and did not limit the consent to her residence. The magistrate found that the marijuana patch growing 25 feet from the defendant's residence was in plain view and was subject to a warrantless search and seizure under the plain view doctrine.

The magistrate also made findings on the record that the defendant was not in custody at the time she gave statements to SA Kleckner, and that, based on the totality of the circumstances present, a reasonable person in defendant's position would not have perceived that her freedom of action was restrained to the degree associated with formal arrest. No <u>Miranda</u> warnings were necessary or required. The magistrate found that defendant's statements were not involuntary.

## DECISION

### I. Permission to Search.

The Fourth Amendment prohibition of unreasonable search and seizure is not violated where the defendant voluntarily consents to the search. The government bears the burden to prove by a preponderance of the evidence that consent to search was voluntarily given. Awareness of the right to refuse is not necessary for the consent to be voluntary. Individual characteristics of the defendant are relevant to the issue of the voluntariness of the consent:

4

(1) age; (2) general intelligence and education; (3) whether she was under the influence of alcohol or drugs; (4) whether she was informed of her Miranda rights; and (5) whether she had experienced prior arrests and was therefore aware of the protections that the legal system affords to suspected criminals. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990), cited and relied upon in United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001).

In examining the environment in which the consent was given, courts ask (1) whether the defendant was detained and, if so, for how long; (2) whether the police threatened, physically intimidated, or punished her; (3) whether the police made promises or misrepresentations; (4) whether she was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether she stood silently by as the search occurred. United States v. Chaidez, 906 F.3d at 381.

Viewing the totality of the circumstances, it is apparent that the defendant's consents to search were not involuntary. She contends that a consent to search was limited to her residence. "A consensual search may not legally exceed the scope of the consent supporting it." *Id.* There was no evidence in the record to support a restrictive meaning of defendant's affirmative answer to the deputy Marshal's inquiry whether he could "look around." Defendant's behavior during the searches is relevant when assessing the scope of the consents. *Id.* Defendant was in her kitchen at the time of the first search on September 9. She did nothing to stop the search or express any concern that the search had exceeded the scope of her consent. She did nothing to attempt to retract or narrow her consent. Accordingly, the Court concludes that the extent of the consents granted was not exceeded. The defendant not only consented to the second search on September 9, but also participated and assisted in the search of the property over a quarter mile from her residence. The searches did not exceed the scope of the consents given.

Defendant contends that the officers could only have obtained consent from the persons who exercise control over the property but the evidence in the record showed that she was the one in control of the entire property, including the out buildings and sundance area. She also contends that the show of force exhibited by five officers from three separate law enforcement agencies affect how a reasonable person in defendant's position would have viewed her situation. "[T]he mere presence of some police officers in a confined space does not necessarily exert

5

coercion of a constitutionally-defective nature . . . The relevant inquiry rather is whether the officers did anything to affirmatively communicate to the defendant that she was not free to terminate the encounter or to refuse the consent request." United States v. Zamoran-Coronel, 231 F.3d 466, 469 (8th Cir. 2000). There was no evidence submitted to support the contention that the officers threatened, intimidated, or otherwise coerced defendant to consent to the searches. Based upon the totality of the circumstances, the searches did not exceed the scope of the consents given. Any evidence obtained was not obtained in violation of the Fourth Amendment.

## II. Suppression of Statements.

The United States Supreme Court held in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that any time a person is taken into custody for questioning they must be advised of their Fifth Amendment rights to be free from compulsory self-incrimination and to the assistance of counsel. There is no dispute here that the agent did not issue the standard Miranda warnings before questioning the defendant.

"Custody" for the purposes of a Miranda analysis "occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of [her] freedom of action in *any* significant way." Griffin, 922 F.2d at 1347. The Court must consider whether a reasonable person in defendant's position would have believed that her freedom of movement was limited by law enforcement officers to a degree associated with formal arrest. United States v. Bordeaux, 400 F.3d 548, 559-60 (8th Cir. 2005). The relevant inquiry is how a reasonable person would have understood her situation. United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004). "In making that evaluation, we consider the totality of the circumstances that confronted the defendant at the time of questioning." *Id.*

The Eighth Circuit has held that "the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation." Griffin, 922 F.2d at 1348. SA Kleckner's interview of the defendant on September 9, 2004, was not a custodial situation when viewed in light of those factors. The defendant was seated at her kitchen table with another male present. She was questioned on her own "turf," a very relevant factor. Czichray, 378 F.3d at 826. The door was

6

not locked to prevent her from leaving. In fact, apparently there was no door at all at that time. The duration was very short, lasting ten minutes. Defendant was clearly not in custody when she was interviewed by SA Kleckner. Therefore, there was no requirement that SA Kleckner advise defendant of her Miranda rights to remain silent and to have an attorney present prior to taking statements from her.

The Eighth Circuit set forth in Griffin several common "indicia of custody" considerations relating to "police practices employed during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation." Griffin, 922 f.2d at 1349. Those factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349.

The Griffin indicia factors, while instructive, are not dispositive. Bordeaux, 400 F.3d at 560. They are merely one means of analyzing whether the defendant had a reasonable subjective belief that her "freedom of action [was] curtailed to a degree associated with formal arrest" and "whether that belief [was] objectively reasonable under the circumstances." Griffin, 922 F.2d at 1349. The Eighth Circuit held in Griffin that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." Griffin, 922 F.2d at 1349. The FBI routinely informs suspects of their "Griffin rights" as a matter of course. SA Kleckner testified that he told defendant that she did not have to talk to him but he did not tell her she that would not be arrested after the interview. "There is no requirement . . . that the *Griffin* analysis be followed ritualistically in every *Miranda* case . . . the court must consider whether the historical facts, as opposed to the one-step removed *Griffin* factors, establish custody." Czichray, 378 F.3d at 827-28.

7

Taking into account the totality of the circumstances, a reasonable person in the defendant's position would not have understood that she was in custody at any time. SA Kleckner was not, under the circumstances present, required to warn the defendant of her Fifth Amendment privilege against self-incrimination and the right to the assistance of counsel as required by Miranda prior to talking with the defendant on September 9, 2004.

## B. Voluntariness.

The Fifth Amendment prohibits authorities from "compelling" a person to give an incriminating statement. Therefore, "[v]oluntariness remains the standard for admissibility" of defendant's statements. United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989). The Eighth Circuit has described this voluntariness inquiry as the "overborne will" doctrine. Jorgensen, 871 F.2d at 729. *See also* LeBrun, 363 F.3d at 725 ("our polestar always must be to determine whether or not the authorities overbore the defendant's will"); Bordeaux, 400 F.3d at 560 ("A statement is involuntary if it was extracted by use of physical and or psychological pressure that overbore a defendant's will."). A statement is not involuntary "unless it is established that law enforcement officials engaged in coercive activity." Bordeaux 400 F.3d at 560.

There is no evidence of any coercive activity. Defendant argues that she was coerced to speak with SA Kleckner due to law enforcement's "show of force on the day of her statements. and the serious accusations made against her." As set forth above, "the mere presence of some police officers in a confined space does not necessarily exert coercion of a constitutionally-defective nature" United States v. Zamoran-Coronel, 231 F.3d at 469.

Based upon the foregoing,

IT IS ORDERED:

1. The defendant's objections (Doc. 48) to the magistrate's report and recommendation are overruled.

2. The report and recommendation (set forth orally on the record and at Doc. 32) are adopted.

8

3. The motion (Doc. 16) to suppress is denied.

Dated this 21st day of May, 2005.

BY THE COURT:

*Charles B. Kornmann*
CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
            DEPUTY
(SEAL)

9